UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA )<br>)<br>V. )<br>) Docket No. 1:20-cr-10198<br>ADRIANO CORTEZ, a/k/a, "A," )<br>)<br>Defendant ) | |

**GOVERNMENT'S TRIAL BRIEF**

The United States, by its undersigned attorneys, respectfully submits this trial brief to identify relevant issues regarding the trial scheduled to begin on October 25 in connection with the above-captioned matter.

1. The Indictment and Summary of Government's Case

Adriano CORTEZ, a/k/a/ "A", is charged in Counts One and Two of a Superseding Indictment with violating Title 21, United States Code, Section 846, Conspiracy to Distribute and to Possess with Intent to Distribute 100 Grams or More of Heroin, 40 Grams or More of Fentanyl, Cocaine Base and Cocaine (Count One), and Title 21, United States Code, Section 841(a)(1) and (b)(1)(B)(i) and (vi) and (b)(1)(C), Possession with Intent to Distribute 100 Grams or More of Heroin, 40 Grams or More of Fentanyl, Cocaine Base and Cocaine and Title 18, United States Code, Section 2, Aiding and Abetting (Count Two).

   a. *2015 Weymouth Drug Arrest and Home Detention with GPS Monitoring*

On March 30, 2015, Weymouth Police Detectives assigned to the Narcotics Unit and South Shore Drug Task Force observed what they believed to be a drug deal take place in a vehicle. Specifically, they were monitoring and surveilling the area of Lincoln Square in Weymouth, MA for illicit narcotics activity, including by sporadically running license plates of cars that passed by.

They observed a white Ford Fusion pass by and when they ran the plate, learned that (1) the car was registered to Amanda Butts, who was known to the Narcotics Unit at that time as a user and distributor of illicit narcotics, and (2) there were active warrants for Butts' arrest.  The detectives thus followed the vehicle and observed a male operator, later identified as CORTEZ, and that there was a female passenger, later identified as Jasmine Brandao.  Detectives saw the vehicle pick up a white male, later identified as Thomas Castle, and drop him off after driving about half a block.

One of the detectives stopped Castle, identified himself as a police officer, and asked about his encounter with the Fusion's occupants.  Castle first said he had given the driver $25 for marijuana and that the driver was going to return with it later.  After detectives questioned this story's validity, Castle directed them to a bag of white powder lying in the street and admitted that he had purchased the bag from the occupants of the Fusion and had thrown it when he saw the detectives pull up.  Castle said the bag contained cocaine and that he had paid $50 with two $20 dollar bills and a $10 dollar bill.  Castle knew the driver as "CoCo" and said he had met CoCo three times previously to purchase cocaine.

This information was conveyed to another detective who had continued to surveil the Fusion.  This detective stopped behind the Fusion, exited his vehicle, and approached the driver's side window, holding his badge and identifying himself as a police officer. CORTEZ put the Fusion into reverse, nearly hitting the detective's car, and then shifted into drive, hitting a second police car that was now in front of the Fusion.  The detective ordered CORTEZ to park the Fusion and after CORTEZ did not, the detective breached the Fusion's driver's side window.  CORTEZ jumped over Brandao and fled through the passenger's side door.[1]

---

[1] Brandao also fled but was apprehended.

Detectives chased CORTEZ, who was now running away with his arms pressed against his sides, holding his jacket against his body. Finally, CORTEZ began walking. As detectives approached, CORTEZ put his hands in his pockets and a struggle ensued with CORTEZ violently resisting and struggling in an attempt to escape. CORTEZ put his right hand into his jacket pocket while swinging his elbows and kicking his feet in an attempt to strike the officers. After a detective struck CORTEZ with his fist, he was secured.

A plastic bag that was sticking out of CORTEZ's right jacket pocket was found to contain three bags of brown and white powder. Additional evidence from inside CORTEZ's jacket included numerous bags of brown and white powder, many individually packaged. An MSP Crime Laboratory chemist is expected to testify that she tested the suspected narcotics found on CORTEZ that day.

CORTEZ was charged in Norfolk Superior Court with Trafficking Over 100 Grams of Heroin and Over 36 Grams of Cocaine, Resisting Arrest, and Malicious Destruction of Property. CORTEZ was released on bail and GPS monitoring. On June 1, 2017, while out on bail, CORTEZ was arrested in Dorchester and charged with Distribution and Possession with Intent to Distribute a Controlled Substance. The court increased CORTEZ's bail and imposed the increasingly restrictive condition of home detention with GPS monitoring.

  b. *2017 Controlled Purchases from "A" by Undercover Agents*

In 2017, a confidential source (CS) provided information to law enforcement that an individual known to him as "A" (later identified as Adriano Cortez) was distributing large quantities of fentanyl, cocaine and other controlled substances in the greater Boston area. Law enforcement learned that CORTEZ was on house arrest and on GPS bracelet monitoring in

Dorchester, MA, in connection with the 2015 Weymouth Case, and was therefore orchestrating deals and sending associates to deliver drugs to his buyers on his (CORTEZ's) behalf.

Thereafter, the BPD, in collaboration with DEA and ATF, initiated an investigation into CORTEZ's drug trafficking operation. Pursuant to this investigation, two undercover officers (UC-1 and UC-2) purchased controlled substances from an individual known to them as "A", whose identity investigation and subsequent events revealed to be CORTEZ, on numerous occasions between September and November 2017. One of the UCs would contact CORTEZ and place orders for fentanyl, cocaine or both and after quantity and price were settled, CORTEZ would provide the UC with a meeting location. After arriving at the meeting location, the UC would be met by one of CORTEZ's co-conspirators, who would provide the UC with the controlled substance(s) they had ordered in exchange for money which the associate would return to CORTEZ.

The government expects to introduce evidence as to ten controlled purchases of suspected narcotics by UC-1 and UC-2 on the following dates: September 12, 2017; September 14, 2017; September 18, 2017; September 22, 2017; September 26, 2017; October 12, 2017; October 19, 2017; October 20, 2017; October 25, 2017; and November 1, 2017. A Massachusetts State Crime Lab chemist is expected to testify that the suspected cocaine and fentanyl purchased by the UCs on these approximately ten occasions were, in fact, cocaine, fentanyl and/or a mixture thereof.

A Massachusetts State Probation Officer who supervised and met with CORTEZ for approximately two years in connection with his 2015 Weymouth case and met with him on numerous occasions in connection therewith is expected to testify as to CORTEZ's GPS monitoring and home confinement conditions in place during the period of the ten controlled buys. This Probation Officer is also expected to testify that the voice captured in recorded conversations

between the UCs and the individual known to them as "A" is the voice of CORTEZ. An employee of the GPS device monitoring company is expected to testify that the GPS data associated with the device affixed to CORTEZ for the dates of the ten controlled buys shows that the device was in the area of 332 Geneva Avenue, where CORTEZ was on home confinement at the time of the controlled buys. Further, the government expects testimony from law enforcement that for numerous buys, CORTEZ's drug runners came from and/or returned to Geneva Avenue around the time of the controlled buys.

2. Stipulations of Fact

None at this time.

The defendant has rejected proposed stipulations by the government regarding the drugs, chain of custody, and the fact that he was on GPS monitoring during the period of the controlled buys taking place from approximately September 2017 through November 2017. If the defendant subsequently agrees to any of the stipulations, the parties will advise the Court.

3. Anticipated Evidentiary Issues

   a. *Recordings*

The government anticipates introducing video recordings of certain of the controlled buys, as well as surveillance videos. These videos also contain audio recording phone calls that the UCs had with the defendant, as well as audio from the controlled buys. The government also expects to introduce audio from a phone call between one of the UCs and the defendant. Federal Rule of Evidence 901(b)(5) permits sound recordings to be introduced through a witness who has "heard either firsthand or though mechanical or electronic transmission or recording, by opinion based upon hearing the voice at any time under circumstances connecting it with the alleged speaker."

The government also expects to also offer testimony from the Probation Officer who supervised CORTEZ for approximately two years in connection with his 2015 Weymouth case and/or a law enforcement officer who has listened to CORTEZ's recorded jail calls identifying the voice of "A" as CORTEZ on the video recordings of certain of the controlled buys and an audio recording of a phone call between one of the UCs and the defendant. Any person may identify the voices on a recording if that person has heard the voices at any time. CORTEZ's supervisory Probation Officer, participants in the conversation, and agents involved in the recording are competent to identify voices in a recording.

    b. *Expert Testimony*

Absent stipulations, the government intends to introduce evidence from MSP Crime Laboratory chemists regarding (1) the narcotics seized at the time of CORTEZ's March 30, 2015 arrest and (2) the fentanyl and cocaine purchased by UC-1 and UC-2 on numerous occasions from September through November, 2017. Under Fed. R. Evid. 702, "[i]f scientific, technical or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified to appear as an expert by knowledge, skill, experience, training or education may testify thereto in the form of an opinion or otherwise" as long as the information is reliable. Courts considering such evidence have consistently "emphasized the fact that expert testimony is admissible where the inference that are sought to be drawn are inferences that a jury could not draw on its own" or even where "the subject looks like one the jury understands from everyday life, but in fact, the inference the jury might draw are erroneous." *United States v. Hines*, 55 F. Supp. 2d 62, 64 (D. Mass. 1999).

  c. *Lay Opinion Evidence*

Because "[l]ay jurors cannot be expected to be familiar with the lexicon of the [drug] community," law enforcement officers may testify as to the meaning of various instances of coded language heard on the recordings. *United States v. Tejeda*, 886 F.2d 483, 486 (1st Cir. 1989) ("clearly permissible" for agent to testify about "the meaning of coded or slang words" in drug cases and noting that "many courts have allowed experienced agents to testify as to the interpretation of drug codes and jargon"); *see also United States v. Santiago*, 560 F.3d 62, 66 (1st Cir. 2006) (undercover agent's testimony about the meaning of code words or phrases used to designate drug quantities was properly admitted as lay opinion testimony). While the government believes this testimony is properly viewed as lay opinion evidence, it also believes that any such witness's training and experience (to be established at trial) qualify him as an expert witness. *Santiago*, 560 F.3d at 66 ("Testimony about coded language . . . can be admissible, depending on its content and other circumstances, either as lay or expert testimony"); *see also United States v. Grullon*, 545 F.3d 93, 95 (1st Cir. 2008) (allowing lay witness testimony of co-conspirator as to the meaning of coded drug talk).

  d. *GPS Monitoring*

As detailed above, at the time of the controlled buys involved in this case (September 2017 through November 2017), the defendant was on pre-trial release from Norfolk Superior Court. As a condition of release, the defendant was ordered to wear a GPS monitoring device, which transmitted information regarding his precise location. On June 1, 2017, while out on bail, the defendant was arrested in Dorchester and charged with Distribution and Possession with Intent to Distribute a Controlled Substance. The court increased the defendant's bail and imposed the

increasingly restrictive condition of home detention at 332 Geneva Avenue, Boston, MA with GPS monitoring. A new GPS bracelet was affixed to the defendant on or about June 5, 2017.

Absent a stipulation, the government will introduce evidence that the defendant was ordered to wear a GPS monitoring device in connection with the 2015 Weymouth Case and was subsequently required to be on home detention at 332 Geneva Avenue in connection with the June 1, 2017 Dorchester case, and regarding the GPS location data transmitted by that device on the dates of the controlled buys.

  e. *Statute of Limitations*

The Court previously denied the defendant's motions to dismiss the indictment on the basis of alleged statute of limitations violations[2] based on evidence showing that the defendant cut off his GPS monitor on November 21, 2017 and was not taken into custody again until July 16, 2020, when he was arrested in Colorado. *See* ECF Dkt. 332. As 18 U.S.C. § 3290 provides that the limitations period is tolled in the case of "any person fleeing from justice," the Court found that the running of the five-year statute of limitations period was presumably tolled during that November 21, 2017 to July 16, 2020 period. *Id.*

To the extent the defendant now re-raises this defense, *see* ECF Dkt. 461 at (Defendant Omnibus Memorandum in Opposition to Government's Motions in Limine) ("Additionally, Cortez has presented a statute of limitations defense and will ask the court to consider lost and destroyed evidence as part of the harm caused by the delay."), the government would seek to introduce evidence as to the defendant cutting off his GPS monitor on or about November 21,

---

[2] The indictment was returned on September 16, 2020, more than five years after the earliest crime charged (March 30, 2015).

2017, his subsequent two-and-one-half-year fugitive status, and the events that led to his ultimate arrest on July 16, 2020.

    *f.  Chain of Custody*

Given that the defendant has indicated he will not stipulate to the drugs in this case, the government expects testimony from officers as to how they packaged the drugs they seized and that the drugs as they exist today are in substantially the same or similar condition; the government expects further testimony from the chemists that the evidence bags from which they obtained the drugs that they tested are those same evidence bags that the officers used to package the drugs.

4. <u>Voir Dire and Jury Instructions</u>

The government filed its proposed voir dire questions and proposed jury instructions today pursuant to the Court's pretrial order.

5. <u>Special Arrangements</u>

    a.  *Paralegal*.  The government respectfully requests that, in addition to trial counsel, the Court allow Julia Griffith, a paralegal from the United States Attorney's Office, to sit at counsel table.  Ms. Griffith is an integral member of the prosecution team and will assist the undersigned counsel in their efforts to introduce the physical evidence, audio recordings, and video recordings in this case.

    b.  *Witnesses*.  All of the government's trial witnesses are local.  However, depending on witness schedules and the actual date that trial is held, the government may request that certain witnesses be allowed to testify out of order.

    c.  *Case Agent*.  The government requests that the Court designate ATF Special Agent Michael Romeo as case agent.

d. *Length of Trial*.  The government expects its case-in-chief to last five days, excluding jury selection.  Should the defendant agree to stipulate as to drugs, GPS monitoring, and/or chain of custody, the government expects its case-in-chief to last three to four days.

e. *Remote Courtroom Access Functionality for UC-1 and UC-1 Testimony*.  The government requests that during the testimony of UC-1 and UC-2, the Court allow audio remote access only (and not video), to protect the safety of UC-1 and UC-2 and permit the continued integrity of their ongoing and future investigations.

Respectfully submitted,

NATHANIEL R. MENDELL
Acting United States Attorney

By:   */s/ Sarah B. Hoefle*
John T. Mulcahy
Sarah Hoefle
Assistant United States Attorneys

Certificate of Service

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF).

*/s/ Sarah B. Hoefle*
Sarah B. Hoefle
Assistant U.S. Attorney
Dated: October 13, 2021